**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| JASON JOHN DIAZ NAVARRETE, JOYCE KRISTINA GABATON CASTILLANO, KATRYN GRACE ASERON, and JHON GERALD RELOQUIO, | Case No.: 4:25-cv-00635 |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| v. | **CLASS AND COLLECTIVE ACTION** |
| CONEXUS MEDSTAFF LLC, | |
| Defendant. | |

**<u>CLASS AND COLLECTIVE ACTION COMPLAINT</u>**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

JURISDICTION AND VENUE ........................................................................................ 6

PARTIES ............................................................................................................................ 6

CLASS AND COLLECTIVE DEFINITIONS ................................................................ 7

FACTUAL ALLEGATIONS ............................................................................................ 8

    I.    Conexus's Business Model Preys on a Vulnerable Population ........................................ 10

    II.    Conexus Misrepresents the Nature and Legality of its Sham Contract to Plaintiffs to Ensure They Continue Laboring for Conexus ................................................................................................ 12

    III.    Conexus's Sham Contracts Are Designed and Operate to Force Foreign Healthcare Workers to Labor for Conexus and Its Clients ...................................................................................... 15

        A.    Restraints in Place Upon Signing Contract ................................................................. 16

        B.    Restraints in Place Upon Start of Employment ........................................................... 17

        C.    Restraints in Place After a Healthcare Worker's Departure from Conexus .................. 19

        D.    The Sham Contract Also Threatens Immigration Consequences for Breach of Contract . ................................................................................................................................ 20

    IV.    Healthcare Workers Reasonably Fear Substantial Harm if They Leave Their Employment with Conexus Prior to Satisfying the Minimum Hours Requirement ...................................... 21

    V.    Conexus Willfully Does Not Pay Healthcare Workers the Appropriate Prevailing Wage or Overtime Rate in Violation of the FLSA .................................................................................. 23

    VI.    Conexus's Unlawful Employment Practices Adversely Impacted Plaintiffs .................. 26

        A.    Conexus Forced Plaintiff Jason John Diaz Navarrete to Labor and to Labor for an Unlawfully Low Rate of Pay ................................................................................... 26

        B.    Conexus Forced Plaintiff Joyce Kristin Gabaton Castillano to Labor for an Unlawfully Low Rate of Pay ................................................................................... 30

        C.    Conexus Forced Plaintiff Katryn Grace Aseron to Labor for an Unlawfully Low Rate of Pay ................................................................................................................... 34

        D.    Conexus Forced Plaintiff Jhon Gerald Reloquio to Labor for an Unlawfully Low Rate of Pay ................................................................................................................... 38

CLASS ALLEGATIONS ................................................................................................ 42

COUNT ONE.................................................................................................................. 45

COUNT TWO................................................................................................................. 47

COUNT THREE ............................................................................................................. 48

COUNT FOUR ............................................................................................................... 49

COUNT FIVE ................................................................................................................. 50

COUNT SIX ................................................................................................................... 51

COUNT SEVEN ............................................................................................................. 52

PRAYER FOR RELIEF ................................................................................................. 53

JURY DEMAND ............................................................................................................ 54

Plaintiffs Jason John Diaz Navarrete, Joyce Kristin Gabaton Castillano, Katryn Grace Aseron, and Jhon Gerald Reloquio (collectively, "Plaintiffs"), through their undersigned counsel file this Class and Collective Action Complaint ("Complaint") against Defendant Conexus MedStaff LLC ("Defendant" or "Conexus"), seeking all available remedies under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1589, *et seq.*, and the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 201, *et seq.* ("FLSA"). The allegations are based on personal knowledge as to Plaintiffs' own conduct and are made on information and belief as to the acts of others.

## INTRODUCTION

1.      This case concerns a labor trafficking scheme whereby Conexus threatens a class of foreign healthcare workers with serious financial harm and abuse of the legal process to secure an artificially cheap and captive supply of labor, which it then sells to healthcare providers at a profit. Plaintiffs allege labor trafficking as well as failure to pay proper wages.

2.      Conexus is a foreign labor recruiter who has recruited Plaintiffs and thousands of nurses, nursing students, medical technologists, and other health care professionals ("Healthcare Workers") from the Philippines and other countries to work for Conexus in Texas and across the United States. Conexus directs Healthcare Workers to sign unenforceable, draconian employment agreements (the "Sham Contracts") and uses these Sham Contracts as a coercive mechanism to ensnare the Healthcare Workers in indentured servitude.

3.      Conexus was founded in 2010, and over the last fifteen years it has hired thousands of Healthcare Workers from over 150 countries to staff hospitals and healthcare facilities in twenty states across the United States.

4.      Conexus's business model involves recruiting trained Healthcare Workers from abroad and bringing them to the United States to labor for Conexus's benefit. Conexus promotes their services by claiming that by signing on to work for Conexus, Healthcare Workers will advance their economic position by securing a well-paying nursing job in the United States. Yet, after Healthcare Workers sign on to work for Conexus, Conexus pays them less than promised, tells Healthcare Workers that they will owe tens of thousands of dollars if they leave their jobs, and traps them in their jobs to sell thousands of hours of their labor to Conexus's clients at a profit.

5.      Conexus derives its power over the Healthcare Workers by telling them that the purported contract they sign when they first agree to work with Conexus—the Sham Contract—is valid and binding. It is not.

6.      Conexus's Sham Contract includes an astronomical liquidated damages clause, including a penalty of $50,000 plus actual damages if the employee quits before completing a certain number of hours—5,000 hours at a minimum and sometimes more (the "Indentured Servitude Penalty"). Conexus's Sham Contract also includes other penalties for leaving employment early (such as loss of paid time off ("PTO")) as well as restrictive non-compete and non-solicitation provisions.

7.      These Sham Contracts are *per se* illegal, because Conexus knows the Sham Contracts are unenforceable. The Indentured Servitude Penalty included in the Sham Contract is unenforceable because its liquidated damages provisions levy such an extremely large penalty, untethered from actual damages, that it is unconscionable and invalid under Texas law.

8.      Indeed, Conexus knows this and conceals the existence of the Sham Contracts from the U.S. government in the course of the Healthcare Workers' visa applications. Prior to their visa interviews with the United States Department of State, Conexus requires Healthcare Workers to

sign new contracts that omit the Indentured Servitude Penalty. These new contracts expressly supersede any previous agreement, yet Conexus nevertheless instructs Healthcare Workers, both throughout the visa process and during their orientation in the United States, that the Sham Contract is binding and that any individuals who do not work the requisite number of hours, or otherwise "violate" the terms of the Sham Contract, will be subject to the Indentured Servitude Penalty and any litigation necessary to collect it. Conexus requires that Healthcare Workers sign new contracts because it knows that the Sham Contracts are illegal and would not pass governmental muster.

9.     Conexus uses the Sham Contracts to make Healthcare Workers reasonably fear that they will face substantial harm if they breach the contract by ceasing to work for Conexus. The Sham Contract provisions threaten dire consequences in the form of monetary penalties, civil litigation, and restrictions on finding other gainful employment. These threats allow Conexus to maintain a captive workforce of Healthcare Workers who must labor for years before they can terminate their employment without penalty.

10.     Conexus is motivated to trap Healthcare Workers in their jobs because it can sell their labor at a steep profit. With shortages of healthcare workers throughout the United States, especially in rural areas, there is a high demand from healthcare providers for the unique population of skilled Healthcare Workers that international recruiters like Conexus can supply. Conexus profits by charging its clients (*i.e.*, hospitals and healthcare facilities) a high fee for the Healthcare Workers' labor. Conexus uses a fraction of that fee to pay Healthcare Workers for the labor that they perform for the healthcare providers, and it pockets the difference between the fees it charges and the wages it pays. Consequently, the longer Conexus can make Healthcare Workers

continue to work for a given client, and the less Conexus pays the Healthcare Workers, the more money Conexus receives.

11.     Because Conexus operates as the middleman between healthcare providers and Healthcare Workers, however, Conexus faces a conundrum: once in the United States, Healthcare Workers have many lucrative options for alternative employment positions in which Conexus would no longer be able to sell the Healthcare Workers' labor. While Conexus could address this issue by paying Healthcare Workers higher wages, competitive with other employment options, this would cut into Conexus's profit. Accordingly, to keep its profits flowing, Conexus uses threats of oppressive monetary penalties, restrictive non-compete and non-solicitation provisions, and arbitrary rules restricting secondary employment to ensure that the Healthcare Workers face extreme barriers to leaving their jobs.

12.     It is not only Conexus that benefits from this arrangement. Indeed, the inability of Conexus's Healthcare Workers to leave their jobs is one of the company's selling points when marketing to healthcare providers. As Conexus boasts on its website, "hiring nurses on shorter contracts can be more expensive and fail to offer patients continuity of care. It's for these reasons that some facilities are exploring alternative options, including the recruitment of overseas nurses. . . . These nurses have a reputation for making an immediate impact through increasing patient satisfaction *and lowering costs through the mitigation of staff turnover and a reduction in reliance on temporary contracts*."[1]

13.     The Sham Contracts that trap Healthcare Workers in Conexus's employment also remove competitive pressure for Conexus to pay Healthcare Workers a fair wage. Conexus in turn

---

[1] Conexus MedStaff, Expanding Your Nursing Team: When is the Right Time?, January 10, 2020, https://www.conexusmedstaff.com/expanding-your-nursing-team-whens-the-right-time (last visited January 23, 2025) (emphasis added).

4

unlawfully compensates Healthcare Workers at rates below the prevailing wage mandated by the visas that Healthcare Workers receive.

14.    The U.S. Government sets prevailing wages at various levels for healthcare workers that account for job title, experience, and geographic area. Conexus uses these required prevailing wages to entice Healthcare Workers to sign up for employment; the compensation advertised is significantly higher than what is available in the Healthcare Workers' home countries. Upon arrival in the United States, however, Conexus improperly pays all Healthcare Workers at the lowest level of prevailing wage, regardless of their job duties, seniority, and experience. Healthcare Workers are aware that others working the same positions are earning more, but Conexus's Sham Contracts restrict them from seeking more lucrative employment elsewhere.

15.    Conexus abuses the legal process by knowingly leveraging the Sham Contracts to keep Healthcare Workers trapped in their jobs, and exploits Healthcare Workers' particular vulnerabilities to force them to continue laboring for Conexus. Healthcare Workers typically have little means, having traveled to the United States hoping to advance economically, and they have a limited support system, working in a foreign country without the support of their families and communities. Conexus preys on its Healthcare Workers' unfamiliarity with the U.S. legal system and U.S. contract law to induce Healthcare Workers to sign Sham Contracts that Conexus knows are invalid. Conexus then threatens collections, legal action, and immigration penalties if a Healthcare Worker declines to perform the nonbinding mandates of the Sham Contract.

16.    This lawsuit seeks to end Conexus's illegal practices and to compensate the Healthcare Workers through two categories of claims.

17.    First, Plaintiffs bring a class action pursuant to Rule 23(b)(2) and Rule 23(b)(3) of the Federal Rules of Civil Procedure asserting forced labor claims under federal law. Employers

are not permitted to use or to attempt to use the threat of substantial harm – including financial

harm and abuse of the legal system – to keep people trapped in their jobs. Conexus's threats of

collection, litigation, and extraordinary financial penalties if Healthcare Workers try to leave their

jobs violate federal forced labor laws.

18.     Second, Plaintiffs assert a claim under the FLSA due to Conexus's policy of

willfully failing to properly pay all overtime compensation owed for all hours worked over forty

in a workweek to non-exempt employees in violation of the FLSA. Specifically, Conexus failed

to pay Plaintiffs and other non-exempt employees prevailing wages, bonuses, and shift

differentials, and as a result of this failure, systematically deprived Plaintiffs and similarly situated

employees of significant overtime wages to which they were due. Conexus also fails to include

non-discretionary bonus payments into Plaintiffs' and Collective Members' (defined below)

regular rates of pay for purposes of their overtime calculations.

## JURISDICTION AND VENUE

19.     Jurisdiction is proper under 28 U.S.C. § 1331 because this is a civil action arising

under the laws of the United States, namely 18 U.S.C. § 1581 and 29 U.S.C. § 216(b) *et seq.*, and

because 18 U.S.C. § 1595(a) provides that such actions may be brought "in an appropriate district

court of the United States[.]"

20.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391. Defendant maintains

its principal place of business in this District and conducts a substantial portion of its business

activities in this District.

## PARTIES

21.     Plaintiff Jason John Diaz Navarrete is a registered nurse who was formerly

employed by Conexus from May 2021 to July 2023. He is a citizen of the Philippines and a lawful

permanent resident of the United States. He lives in California. Plaintiff Navarrete consented in writing to be a Plaintiff in this Action. *See* Ex. A.

22.     Plaintiff Joyce Kristin Gabaton Castillano is a registered nurse who was formerly employed by Conexus from May 2021 to August 2023. She is a citizen of the Philippines and a lawful permanent resident of the United States. She lives in North Carolina. Plaintiff Castillano consented in writing to be a Plaintiff in this Action. *See* Ex. B.

23.     Plaintiff Katryn Grace Aseron is a registered nurse who was formerly employed by Conexus from February 2022 to April 2023. She is a citizen of the Philippines and a lawful permanent resident of the United States. She lives in North Carolina. Plaintiff Aseron consented in writing to be a Plaintiff in this Action. *See* Ex. C.

24.     Plaintiff Jhon Gerald Reloquio is a registered nurse who is currently employed by Conexus. He is a citizen of the Philippines and a lawful permanent resident of the United States. He lives in North Carolina. Plaintiff Reloquio consented in writing to be a Plaintiff in this Action. *See* Ex. D.

25.     Defendant Conexus is a limited liability company organized in Texas and with its principal place of business in Texas. Conexus's headquarters are located at 11750 Katy Freeway, Suite 750, Houston, Texas 77079-1134.

## CLASS AND COLLECTIVE DEFINITIONS

26.     Plaintiffs bring this lawsuit as a class action on behalf of themselves and all others similarly situated under Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

7

27.     Plaintiffs bring Counts I through V of this lawsuit pursuant to the Trafficking

Victims Protection Reauthorization Act on behalf of a class of Healthcare Workers defined as

follows:

> All persons who worked for Conexus MedStaff as foreign healthcare workers in the
> United States during the ten (10) years prior to the filing of this complaint (the "Healthcare
> Worker Class" or "Class Members").

28.     Plaintiffs bring Count VI of this lawsuit pursuant to the FLSA, 29 U.S.C. § 216(b),

as a collective action on behalf of themselves and the following similarly situated persons:

> All current and former hourly paid, non-exempt foreign healthcare workers that worked
> for Conexus MedStaff at a healthcare facility contracted with Conexus MedStaff during
> the past three years in the United States and who worked more than forty (40) hours in at
> least one workweek (the "FLSA Collective" or "Collective Members").

29.     Plaintiffs reserve the right to redefine the Healthcare Workers Class and/or the

Collective prior to notice or class certification, and thereafter, as may be warranted or necessary.

## **FACTUAL ALLEGATIONS**

30.     Over the last 75 years, employers in the United States have relied on large-scale

migration of foreign healthcare workers, especially those from the Philippines, to staff their

healthcare facilities, especially in times of medical crisis. These workers are essential to the

effective and safe functioning of the U.S. health care system.

31.     Recently, shortages of healthcare workers have led hospitals in the U.S. to

dramatically accelerate hiring from abroad. Countries like the Philippines, India, Nigeria,

Zimbabwe, and Jamaica have historically sent trained, experienced healthcare workers to work in

the U.S. But after the start of the COVID-19 pandemic, this trickle of foreign nurses became a

flood. As of 2022, there were about 500,000 immigrant nurses in the U.S., accounting for approximately one in six nurses total.[2]

32.     During the COVID-19 pandemic, wave upon wave of COVID infections put a massive strain on U.S. healthcare systems and the healthcare workers that served them. In prior years, many healthcare systems had reduced staff. The skeletal teams that remained in 2020 were overloaded with patients, shifts were stretched beyond the standard 12-hour period, and healthcare systems were straining against the limits of safety.[3]

33.     Moreover, in the face of the risks of COVID-19 and burnout from their working conditions, healthcare workers left their jobs *en masse*. From February to April 2020 alone, the U.S. healthcare sector shed more than 1.5 million jobs—nearly 10% of the total healthcare workforce at the time.[4]

34.     Faced with staffing shortages in the United States and a healthcare crisis that required consistent, ready, and willing labor, healthcare providers turned to foreign healthcare workers to fill this urgent need. Companies like Conexus sought to exploit the labor shortage in the U.S. healthcare system by supplying labor through using a captive foreign workforce.

35.     The high demand for healthcare workers created a dynamic whereby Conexus is motivated to use exhortative practices to deceive its Healthcare Workers into signing Sham

---

[2] Drishti Pillai et al., *The Growing Role of Foreign-Educated Nurses in U.S. Hospitals and Implications of Visa Restrictions*, KAISER FAMILY FOUNDATION, July 10, 2024, https://www.kff.org/policy-watch/the-growing-role-of-foreign-educated-nurses-in-u-s-hospitals-and-implications-of-visa-restrictions/.

[3] Aurora Almendral, *Rich Countries Are Importing a Solution to Their Nursing Shortages – and Poor Countries Are Paying the Price*, TYPE INVESTIGATIONS, Sept. 27, 2023, https://www.typeinvestigations.org/investigation/2023/09/27/rich-countries-are-importing-a-solution-to-nursing-shortages/.

[4] *Id.* (citing Federal Reserve Economic Data, https://fred.stlouisfed.org/series/CES6562000101).

Contracts, thereby preserving Conexus's ability both to profit off their labor and to serve healthcare providers' interest in a reliable, captive labor pool.

36.     While Healthcare Workers who come into the U.S. are legally protected by the same employment laws as U.S. citizens, in practice agencies like Conexus prey on vulnerable foreign Healthcare Workers, including Plaintiffs. Conexus lures Healthcare Workers to the United States with promises of economic freedom and upward mobility, but then imposes onerous restraints that force them to continue working through threats of grave financial harm and abuse of the legal process.

**I.     Conexus's Business Model Preys on a Vulnerable Population**

37.     Conexus is an employer that actively recruits international nurses, international nursing students, medical technologists, and other healthcare workers from abroad.

38.     Conexus was founded in 2010, and over the last fifteen years it has hired thousands of Healthcare Workers from over 150 countries to staff hospitals and healthcare facilities in twenty states across the United States.

39.     Conexus's business involves recruiting Healthcare Workers from abroad, transporting them to the United States, and then selling their labor to hospitals and healthcare facilities.

40.     Conexus profits handsomely off the labor of the foreign Healthcare Workers that it recruits. Conexus charges its client hospitals and healthcare facilities hourly fees to access the Healthcare Workers' labor. These fees are more than double what Conexus pays its Healthcare Workers per hour. Payment for the Healthcare Workers' labor is intended to come out of that amount, with Conexus keeping the difference.

41.     Conexus accordingly only profits for as long as a given Healthcare Worker continues to work for its client under Conexus's umbrella. This incentivizes Conexus to keep the

Healthcare Workers working with Conexus for as long as possible. And the more Conexus suppresses Healthcare Workers' wages, the more profit it makes for every hour a Healthcare Worker works.

42.    Conexus recruits Healthcare Workers through promises that working for healthcare facilities in the United States is a pathway for upward mobility and security. Conexus advertises hourly rates that are significantly higher than what Healthcare Workers stand to make while working in their home countries. Conexus also promises Healthcare Workers shift differentials, that is, extra payment for night and weekend work, and bonuses for every 1,000 productive hours worked.

43.    Conexus tells Healthcare Workers that Conexus will manage the immigration and visa process for them and connect them with healthcare facilities in the United States that can sponsor their visas. However, Conexus also tells Healthcare Workers that they will not pay any fees for the immigration process or for their job placement. Navigating the immigration process individually typically is impossible for Healthcare Workers, who often have limited contacts in the United States or familiarity with the immigration system. Conexus holds itself out as a company that can help Healthcare Workers gain lucrative employment opportunities that otherwise would be out of reach for them.

44.    Conexus fails to publicize, however, that, to access these opportunities, all Healthcare Workers must sign Sham Contracts that include the Indentured Servitude Penalty—a provision by which they must work thousands of hours for Conexus's benefit or be subject to extortive fees that amount to over a year's wages. Instead, Healthcare Workers first learn of the Indentured Servitude Penalty when they receive their purported employment contract, a point *after* which they've interviewed with Conexus and informally accepted a position from it.

11

45.    Conexus pressures Healthcare Workers to sign their purported employment contracts quickly upon receipt. Plaintiffs understood that other opportunities to work for U.S. healthcare facilities are difficult to obtain and they had little to no knowledge about U.S. contract law. Without an understanding of the legal system, Plaintiffs did not know the contracts they were directed to sign were unenforceable Sham Contracts and did not believe they had any ability to negotiate with Conexus for changes to the contract provisions.

## II.    Conexus Misrepresents the Nature and Legality of its Sham Contract to Plaintiffs to Ensure They Continue Laboring for Conexus

46.    When a Healthcare Worker accepts a job with Conexus, they are required to sign a Sham Contract that Conexus knows is invalid and unenforceable. *See* Exs. E, L. Despite knowing this, Conexus tells Healthcare Workers that the contract is a binding employment contract.

47.    The Sham Contract imposes a $50,000 Indentured Servitude Penalty upon any Healthcare Worker who fails to perform a minimum of 5,000 hours of labor for Conexus. The $50,000 penalty is disproportionate as compared to the compensation paid to the Healthcare Workers. It constitutes more than a year's salary for a Healthcare Worker earning $24.00 an hour. Furthermore, the 5,000-hour minimum set by Conexus amounts to approximately two and a half years of labor, when calculated at 40 hours a week.

48.    The contracts also provide that the Indentured Servitude Penalty will apply upon a Healthcare Worker's termination for "cause," a standard that is essentially meaningless as it applies based on any "actions that Conexus in its sole discretion determines is in its material detriment." Finally, certain activities connected to seeking alternate employment will likewise amount to a breach of the contract, basis for termination for cause, and can invoke the Indentured Servitude Penalty. These penalties, however, are unenforceable under Texas law because the

Indentured Servitude Penalty is untethered from actual damages, or any actual expenses Conexus incurred in its recruitment of the Healthcare Workers. It is purely punitive.

49.     The Sham Contract containing the Indentured Servitude Penalty is also not enforceable because it is not the operative, binding contract between Healthcare Workers and Conexus. Instead, Conexus provides Healthcare Workers with updated contracts that it directs they sign and submit to the United States Department of State through the visa process.

50.     Specifically, when a Healthcare Worker is scheduled to appear at the United States embassy or consulate in connection with their immigrant visa interview, Conexus coaches them on how to conduct themselves in the interview. Conexus tells Healthcare Workers to not tell the government what they will be paid and tells them to say nothing about the Indentured Servitude Penalty. *See* Exs. F, G, H. Three examples of Conexus's embassy interview guidelines which were given to Plaintiffs are below:

- If the consul asked for specifics about the Amount or fees if she/he won't be able to complete the contract in Conexus? **You will let them know and say NOTHING since stated in the contract NO COLLECTIBLE AMOUNT relating to expenses in the immigration process. Also, the agency covered all advances and shoulder the expenses by the agency (Conexus). However, in 6.5 Agency might seek for expenses including out of pocket and costs incurred by Conexus to ensure nurses' successful transition to work and life in the USA.**

- When did you graduate? Where?
- If the consul asked for specifics about Amount or fees if she/he won't be able to complete the contract in Conexus? **You will let them know and say NOTHING, as the agency covered all advances and shoulder the expenses by agency (Conexus)**
**P.S The consul will be explained that they have to go through contracts being signed to make sure we know what's written on it.**

    **Employment Agreement**
    - Will the agency pay for your accommodation and airfare? Yes.
    - How long will the agency pay for your accommodation? One month.
    - Will you be paying anything if you won't be able to complete your contract? NONE

51.     Conexus also provides Healthcare Workers documentation to give to the United States Department of State employee that lays out their *bona fide* job offer with Conexus and its

client hospital or healthcare facility in the United States. This documentation includes an updated employment contract that Healthcare Workers are instructed to sign and submit to the U.S. Department of State. *See* Exs. J, K.

52.     The updated contract includes many of the same provisions as the Sham Contract that Healthcare Workers receive when they first sign on with Conexus, with one notable exception: it omits the Indentured Servitude Penalty. Instead, the proffered contract states that Conexus can only recover expenses related to travel, credentialing, and licensure, as well as bonus advances, living expenses, and all applicable damages under Texas law. The updated contract also provides that it "constitutes the entire understanding between the parties relating to the subject matter of the Agreement and….supersedes any and all other agreements, representations or negotiations either oral or in writing, between the parties." Conexus knows the Sham Contract is invalid because the contract that Healthcare Workers must sign and give to the U.S. government clearly states that any previous contracts have been superseded.

53.     Conexus gave Plaintiffs letters that provided an explanation of the revised employment agreement. Conexus stated that it "operates in a regulatory industry with various government agencies such as the U.S. Citizenship and Immigration Services ("USCIS"), the U.S. Department of Labor ("DOL"), and local regulatory agencies. Periodically, these agencies change their requirements and therefore to comply with them, Conexus must revise its documents including the Employment Agreement, to support a successful outcome of your process and a positive experience."

54.     The letter identified three changes made to the contract: the removal of 1) the payrate, 2) information regarding the benefits from the contract, and 3) the Indentured Servitude Penalty. The letter also explained the reasoning behind the removal of the first two provisions and

14

indicated that they would not control going forward.

55.    As to the Indentured Servitude Penalty, however, Conexus's letter made clear that this provision was stripped from the contract to be provided to the U.S. Embassy, but nonetheless indicated that Plaintiffs would still be liable for it. The letter states:

> Termination – In cases where a Healthcare Professional fails to complete their employment term, the Healthcare Professional acknowledges that Conexus has incurred significant expenses for recruitment, immigration and ensuring a successful transition to the U.S. The amount that Conexus may seek from a Healthcare professional will be no more than $50,000 (fifty thousand U.S. dollars) that will be a pro-rated amount based on the number of hours worked and number of hours remaining in the employment term. *See* Exs. I, N.

56.    Conexus knows that the Indentured Servitude Penalty is unlawful and unconscionable, so it takes great pains to omit this provision from the operative contracts that it submits for immigration purposes.

57.    Although Conexus knows that, once a Healthcare Worker signs the updated contract, the first, Sham Contract has been superseded, Conexus tells Healthcare Workers that the first contract, and its Indentured Servitude Provision, is binding. Conexus tells Healthcare Workers that it will enforce the Indentured Servitude Provision if they fail to work the required minimum hours requirement or otherwise violate the Sham Contract. Conexus does this to ensure that Healthcare Workers believe that they will face serious financial harm, collections, or lawsuits if they leave their jobs.

## III.    Conexus's Sham Contracts Are Designed and Operate to Force Foreign Healthcare Workers to Labor for Conexus and Its Clients

58.    Conexus's Sham Contracts impose crushing penalties on Healthcare Workers who fail to satisfy Conexus's highly restrictive contractual requirements. These restraints ultimately ensure that Healthcare workers are forced to work for Conexus and its clients for years, regardless of their pay or working conditions.

59.     Conexus's Sham Contract posits that it can invoke the Indentured Servitude Penalty at any time, for any perceived violation. Conexus makes Healthcare Workers reasonably fear that they cannot refuse to work for Conexus or even agitate for improved pay or working conditions, because doing so can result in a dire financial penalty.

60.     Conexus wields a tremendous amount of power over the Healthcare Workers, and its Sham Contract provides layers of coercion and control through every aspect of the Healthcare Workers' employment.

**A.     Restraints in Place Upon Signing Contract**

61.     Conexus drafts its Sham Contracts to substantially limit the agency of Healthcare Workers from the moment they sign the contract. All Plaintiffs reasonably understood that as soon as they signed the Sham Contract with Conexus they would be bound by strict terms and subject to Conexus's unilateral authority.

62.     The Sham Contract provides that, upon satisfaction of all pre-employment requirements, the Healthcare Worker will "make him/herself available for any telephone interviews and [will] accept such employment, if offered." The Healthcare Worker, however, has no input into the healthcare facilities with whom the Healthcare Worker will interview, and for whom the Healthcare Worker will ultimately work. Nor do Healthcare Workers have any say in which state, city, or facility they will work in.

63.     To compel its recruits, all of whom have yet to set foot in the United States, to accept the first position they are offered – regardless of the nature of the position or the particular geographic location of the employment – the Sham Contract expressly states that, if a Healthcare Worker does not accept a deployment offer or is unable after three client interviews to secure an offer for an assignment through Conexus, the Healthcare Worker will be obligated to pay Conexus $5,000 plus actual expenses incurred.

64.     In addition, Conexus's Sham Contract provides that a Healthcare Worker will be subject to the Indentured Servitude Penalty of $50,000 plus actual expenses if he or she "is unable to undertake employment with Conexus," "unwilling to commence employment on the Start Date," or fails to secure "a bona fide offer for placement . . . after having received interviews at three Client Facilities." A Healthcare Worker also will be subject to the Indentured Servitude Penalty through termination for cause if they fail to satisfy the necessary prerequisites for employment, such as submitting immigration paperwork and passing any necessary exams.

65.     Healthcare Workers thus reasonably believe that they are bound, from the moment they sign the Sham Contract, to interview for and accept any offer of employment made to them and to commence employment with Conexus on whatever date Conexus requires. This is true even when considerable time and intervening life events have passed between the Healthcare Workers' signing of the Sham Contract and Conexus's call to action.

**B.     Restraints in Place Upon Start of Employment**

66.     Upon starting their employment at a Conexus client healthcare facility, Conexus mandates that Healthcare Workers must provide Conexus's clients with "a minimum of 5,000 productive hours from the Start Date." The Sham Contract also notes that, once Conexus contracts with a client healthcare provider to supply the Healthcare Worker's labor, "Conexus is entitled to receive the [Healthcare Worker's] services . . . for the entire Working Term of [the] Agreement."

67.     Healthcare Workers who fail to satisfy either the minimum productive hours requirement or the full working term of the agreement are subject to the Indentured Servitude Penalty by Conexus. Healthcare Workers' ability to cease employment at will is thus substantially, if not completely, circumscribed, for fear of facing overwhelming monetary penalties.

68.     Conexus tells Healthcare Workers that the working term of the agreement is subject to the needs of the client and may extend beyond the minimum 5,000 productive hours. Indeed,

the Sham Contract provides that "the actual number of hours [a Healthcare Worker] is required to work for Conexus" may change and will be determined upon the Healthcare Worker's assignment to a Conexus client.

69.    After executing the Sham Contract, Healthcare Workers reasonably believe they have no ability to negotiate to protest a productive hour amount or working term that is higher than the advertised 5,000 hour minimum, for they are told the contract is binding and cannot be severed without triggering the Indentured Servitude Penalty.

70.    The Sham Contract further provides that, even within the working term of the contract, a Healthcare Worker "may not have any choice in the shifts that the [Healthcare Worker] will work at the designated Client Facility during the Working Term as this will depend on the needs of the Facility on the [Healthcare Worker's] Start Date." Conexus can also reassign the Healthcare Worker at will, for failure to accept a new assignment is likewise cause for termination that would trigger the Indentured Servitude Penalty.

71.    In addition to the minimum hour requirement, Conexus prohibits activities that impact Healthcare Workers' ability to look for and obtain alternate employment that could cushion them from the impact of the Indentured Servitude Penalty. Specifically, Conexus's Sham Contract provides that a Healthcare Worker may be terminated for cause, and thus be subject to the Indentured Servitude Penalty, upon breach of *any* contract provision or Conexus policy. These provisions and policies include prohibitions on: 1) contracting with or obtaining or benefiting from the services from any other employment agent or agency; or 2) seeking employment at another healthcare facility or any other employer site without obtaining the written permission from Conexus. The threat of the Indentured Servitude Penalty thus operates to restrict Healthcare

Workers from even looking for another position, which might provide them the economic security needed to risk leaving Conexus's employment.

### C.    Restraints in Place After a Healthcare Worker's Departure from Conexus

72.    Conexus's limitations on Healthcare Workers' ability to obtain alternate employment, which would mitigate the impact of the Indentured Servitude Penalty, even extend after a Healthcare Worker leaves Conexus's employment.

73.    Conexus's Sham Contract prohibits Healthcare Workers from, absent the prior written permission of Conexus, soliciting or accepting a position directly or indirectly with the Client facility where the Healthcare Worker was stationed with Conexus. This prohibition extends from the later of either twelve months after the termination of the employment agreement, or full payment to Conexus of the Indentured Servitude Penalty and any actual damages Conexus alleges it incurred. This means that, if a Healthcare Worker is subject to the Indentured Servitude Penalty, they are totally barred from accepting a position with the Client healthcare facility until they pay the Indentured Servitude Penalty, which would amount to almost a full year's salary.

74.    Conexus also restricts Healthcare Workers' ability to help other Healthcare Workers obtain employment elsewhere and escape the grip that Conexus has over them. The Sham Contract prohibits Healthcare Workers from, during their employment with Conexus and for an entire year thereafter, soliciting, recruiting, or employing Conexus's employees for any other job or suggesting, advising, or encouraging other Healthcare Workers to "breach" their Sham Contract with Conexus.

75.    Healthcare Workers have limited contacts and exposure to alternate employers in the United States. Instead, Healthcare Workers generally know only the individuals that they work with and have often made no other professional relationships in the U.S. Their most immediate avenues for finding alternate employment accordingly are the use of recruiters, contacts at

healthcare facilities where they were previously employed, and referrals from others in the Conexus community.

76.     By limiting Healthcare Workers' ability to look for other employment while they are employed with Conexus and cutting off the most likely sources of future employment after a Healthcare Worker leaves employment with Conexus, Conexus increases the impact of the Indentured Servitude Penalty. For, while the penalty alone is overwhelming, Healthcare Workers will have no chance of paying it if they cannot obtain other employment. These restrictive provisions increase Healthcare Workers' reasonable fear that they will face substantial economic harm upon leaving employment with Conexus.

**D.     The Sham Contract Also Threatens Immigration Consequences for Breach of Contract**

77.     Conexus's Sham Contract and orientation materials also suggest that Healthcare Workers could face immigration consequences for leaving Conexus's employment. The contract states that "failure to abide by the terms of the Agreement or termination of employment may result in cancellation of his/her visa petition and that should cancellation of his/her visa petition require a return to his/her home country. [sic] All expenses will be borne by [Healthcare Worker]."

78.     Conexus's orientation materials likewise instruct: "[t]aking another job can potentially jeopardize your legal status and Conexus can no longer cover the employer portion of your benefits," and "[n]ot prioritizing and not having full-time employment status with Conexus can potentially jeopardize your legal status and benefits."

79.     These claims are untrue. Healthcare Workers are not legally bound to work for Conexus to maintain their immigration statuses. Healthcare Workers, however, have relied on Conexus to file and petition for them, and typically do not know that declining to follow the nonbinding directives of the Sham Contract will not result in the cancellation of their visa.

80.     Conexus falsely tells Healthcare Workers that rejection of the directives of the Sham Contract could result in the cancellation of their visa petition, and that they may have to return to their home country. Conexus makes these claims to dissuade Healthcare Workers from leaving Conexus's employment.

## IV.     Healthcare Workers Reasonably Fear Substantial Harm if They Leave Their Employment with Conexus Prior to Satisfying the Minimum Hours Requirement

81.     Conexus's Sham Contract operates to make Healthcare Workers reasonably fear that they must continue to work for Conexus or face threat of substantial financial harm. This harm takes the form of the crushing Indentured Servitude Penalty, the threat of being sued to collect that Penalty, and restrictions on finding other gainful employment that would allow Healthcare Workers to even begin to pay back the amount they would purportedly owe. Conexus can thus maintain a captive workforce that must labor for years before they feel they can safely end their employment.

82.     The Indentured Servitude Penalty is designed and operates to be prohibitively punitive. The Conexus uniform contract provides that the Indentured Servitude Penalty is "liquidated damages," but this is untrue. The Indentured Servitude Penalty does not reflect and is untethered from actual damages, which are easily quantifiable, and it is not intended to recoup any actual expenses Conexus incurred in its recruitment of the Healthcare Workers. Indeed, the Indentured Servitude Penalty is levied on top of any actual damages that Conexus claims to have incurred.

83.     The Indentured Servitude Penalty is unreasonably large on its face. It is also disproportionate when compared to the compensation paid to Healthcare Workers, who earn $24.00-$28.00 per hour. For a healthcare worker earning $24.00 an hour, the Indentured Servitude Penalty amounts to more than a year's salary. Plaintiffs Navarrete, Castillano, and Reloquio did

not leave their jobs with Conexus until they finished the 5,000 productive hours because the Indentured Servitude Penalty, which amounted to more than $50,000, was equal to or greater than their annual *gross* income.

84.     What is more, Conexus's restrictions on Healthcare Workers' ability to search for and accept alternate employment substantially impedes Healthcare Workers' ability to find alternate work that would allow them to even begin paying the Indentured Servitude Penalty. These restrictions further entrench the Healthcare Workers' reasonable fear of the financial hardship imposed by the Indentured Servitude Penalty. Healthcare Workers understand and fear that, if they quit, potential employers would not hire them if Conexus could sue them or even sue their employers for violating the contract.

85.     Conexus also tells Healthcare Workers, both in their contracts and in orientation material, that their immigration status may be threatened if they break their contracts with Conexus. Healthcare Workers are unfamiliar with the immigration system and many fear possible negative repercussions from their immigration status being threatened. This too would give rise to a reasonable fear of substantial harm in its interference with Healthcare Workers' ability to live and work in the United States.

86.     Healthcare Workers routinely stay in Conexus's employment despite wanting to leave and they do so for fear of substantial harm. Such substantial harm may take the form of financial penalties and restrictions on Healthcare Workers' ability to make a living going forward.

87.     True to its threats, Conexus has indeed sued nurses who Conexus claims have breached their Sham Contracts. *E.g.*, *Conexus Medstaff LLC v. Tolentino*, No. 2019-02309 (Tex. Dist. filed Jan. 10, 2019); *Conexus Medstaff LLC v. Cordova*, No. 2017-74397 (Tex. Dist. filed Nov. 3, 2017).

88.     Conexus sued Philip Tolentino, a nurse working for Conexus as a foreign Healthcare Worker. In his Answer to the lawsuit, Tolentino alleged that Conexus refused to approve Tolentino's requested FMLA leave, and then terminated him. After terminating him, the Answer alleges, Conexus sued Tolentino for breach of contract and sought $50,000 plus actual damages.

89.     Conexus abuses the legal system to ensure that Healthcare Workers are forced to continue laboring for them. Not only does Conexus posture that its Sham Contract is binding, but Conexus goes a step further and threatens Healthcare Workers with the full force of the U.S. legal system by telling Healthcare Workers they will be sued or have to pay tens of thousands of dollars if they breach a contract that has no legal authority.

## V.    Conexus Willfully Does Not Pay Healthcare Workers the Appropriate Prevailing Wage or Overtime Rate in Violation of the FLSA

90.     Conexus willfully does not pay Healthcare Workers the proper prevailing wage. Conexus automatically assigns all Healthcare Workers the entry-level prevailing wage of a new graduate, regardless of the job descriptions and qualification requirements, regardless of the amount the Conexus client pays Conexus for its labor, and ignoring the fact that its recruits have years or decades of substantial professional experience.

91.     Conexus knows or should have known that it does not pay Healthcare Workers the prevailing wages. Conexus is a large corporation, with offices in the United States and abroad. Conexus hires thousands of employees, has a robust Human Resources Department, and employs attorneys to file immigration paperwork for their Healthcare Workers.

92.     Conexus recruits Healthcare Workers through the third-preference employment-based immigrant visa category, also referred to as an EB-3 visa. The EB-3 visa permits foreign healthcare workers with certain degrees and employment experience, as well as sponsorship from

a U.S. employer, to immigrate to the United States and work as lawful permanent residents. Pursuant to an EB-3 visa, foreign healthcare workers receive a "green card" and the opportunity to live and work in the country indefinitely.

93.     Conexus recruits Healthcare Workers by offering to serve as their sponsor, help them navigate the EB-3 visa process, and place them at a healthcare provider. The EB-3 visa program requires Conexus to pay Healthcare Workers the prevailing wage or the actual wage paid by the employer to workers with similar skills and qualifications, whichever is higher.

94.     Under 20 C.F.R. § 656.40, the relevant factors in determining a prevailing wage rate are the nature of the job offer, the area of intended employment, and job duties for workers that are similarly employed.

95.     Within each prevailing wage rate for each locality and position are four wage levels, including:

a.      Level I (entry): Assigned to job offers for beginning level employees who have only a basic understanding of the occupation.

b.      Level II (qualified): Assigned to job offers for qualified employees who have attained – either through education or experience – a good understanding of the occupation.

c.      Level III (experienced): Assigned to job offers for experienced employees who have a sound understanding of the occupation and have attained – either through education or experience – special skills or knowledge.

d.      Level IV (fully competent): Assigned to job offers for competent employees who have sufficient experience in the occupation to plan and conduct work requiring judgment and the independent evaluation, selection, modification, and application of standard procedures and techniques.

96.     Despite recruiting Healthcare Workers with many years of experience into various nursing positions, including as supervisors, Conexus consistently pays its recruits at the entry-level

Level I wage rate, with no consideration for individualized Healthcare Workers' skills or experience.

97.    Conexus willfully pays Healthcare Workers less than the prevailing wage, not only as compared to similarly qualified, equivalent U.S. workers, but even compared with U.S. citizens with much less occupational experience. Conexus does this to maximize its income while exploiting the workers.

98.    Conexus's job descriptions show that Conexus requires that a foreign Healthcare Worker have a bachelor's degree and some experience.[5]

99.    For example, Plaintiffs all had substantially more years of experience than required by Conexus's job descriptions.

100.    Plaintiff Naverrete was paid $28.00 an hour but had over ten (10) years of experience.

101.    In 2022, Plaintiff Castillano was paid $24.00 an hour but had over thirteen (13) years of experience.

102.    Plaintiff Aseron was paid $28.00 an hour but had over fifteen (15) years of experience.

103.    Plaintiff Reloquio was paid $28.00 an hour but had seven (7) years of experience.

104.    Plaintiffs regularly worked over forty (40) hours a week.

105.    The Healthcare Workers also regularly work over forty (40) hours a week.

106.    Because Conexus calculates Plaintiffs' and Collective Members' overtime and incentive premiums based on the unlawfully low hourly rate, Conexus systematically failed to pay

---

[5] Registered Nurse Relocation to the US, https://www.conexusmedstaff.com/job/registered-nurse-relocation-to-the-usa/ (last visited February 10, 2025).

Plaintiffs and Collective Members all overtime wages due under the FLSA. Conexus should have paid the overtime rate on the proper prevailing wage, rather than the unnaturally depressed wage.

107.    When Healthcare Workers do receive a non-discretionary bonus, the bonus should be added to their regular rate of pay for that week to calculate the proper overtime rate payment, but is not, in violation of the FLSA.

108.    Conexus does not pay Healthcare Workers shift differentials, meaning, extra compensation, for night and weekend shifts. Conexus's client facilities often make Healthcare Workers work on nights and weekends so that Conexus can avoid paying shift differentials.

109.    Conexus includes in their Sham Contracts that Conexus has the sole discretion to terminate Healthcare Workers' employment and require them to pay for the Indentured Servitude Penalty. This broad catch all provision ensures that Healthcare Workers do not complain about their depressed wages, or compensation that they were promised but did not receive, for fear of the Indentured Servitude Penalty.

## VI.    Conexus's Unlawful Employment Practices Adversely Impacted Plaintiffs

### A.    Conexus Forced Plaintiff Jason John Diaz Navarrete to Labor and to Labor for an Unlawfully Low Rate of Pay

110.    Plaintiff Navarrete is a registered nurse.

111.    Plaintiff Navarrete is a citizen of the Philippines.

112.    Plaintiff Navarrete attended nursing school in the Philippines and graduated in 2007. He began working as a nurse in 2011 in Saudia Arabia, and then moved to Doha, Qatar, where he worked as a nurse from 2014 to 2021.

113.    Prior to beginning his work with Conexus, Plaintiff Navarrete had approximately ten (10) years of experience as a Registered Nurse.

114.    Plaintiff Navarrete had long dreamed of working in the United States. It took him

many years to achieve his dream, because he needed extensive experience, had to take nursing and English exams, and complete licensure requirements. During the COVID-19 pandemic, when there was a shortage of nurses in the United States, it became easier for him to lawfully immigrate and work in the U.S. healthcare system.

115.    Plaintiff Navarrete first heard about the opportunity to work as a nurse for Conexus as part of an online search. He sent in an application online and secured an interview.

116.    Plaintiff Navarrete applied to Conexus in May 2018. He subsequently interviewed and was accepted.

117.    During his interview process and after, Conexus staff told Plaintiff Navarrete that he would not have to pay for anything, including the first month's housing, plane tickets, and immigrations costs. Conexus did not reveal that Plaintiff Navarrete would have to pay more than $50,000 to break his contract.

118.    In May 2018, soon after agreeing to work with Conexus, Plaintiff Navarrete signed the Sham Contract with Conexus. The contract had a "Damages" provision that included the Indentured Servitude Penalty that indicated Plaintiff Navarrete would have to pay more than $50,000 if he left Conexus before the end of his contract or was terminated, among other triggering events.

119.    Conexus representatives told Plaintiff Navarrete he only had 24 hours to sign the contract, or it would be revoked. Conexus purposefully told Plaintiff Navarrete he had a short amount of time to sign the Sham Contract so that he would feel pressured to accept the contract or lose his chance to work in the United States.

120.    Conexus began Plaintiff Navarrete's immigration process for the EB-3 visa in 2018.

121.    In or around December 2020, Conexus set up an interview with Plaintiff Navarrete

and Atrium Health in Charlotte, North Carolina.

122.    Plaintiff Navarrete could not choose which city or state he wanted to live in, or which hospital he wanted to work at.

123.    Conexus told Plaintiff Navarrete he had to interview with Atrium Health in Charlotte, North Carolina.

124.    Conexus told Plaintiff Navarrete that if he got the job with Atrium Health, he could not turn it down and he must accept it.

125.    Atrium Health agreed to hire Plaintiff Navarrete.

126.    In January 2021, Plaintiff Navarrete had his visa interview at the U.S. Embassy in Doha, Qatar. Prior to his interview, he received a package via DHL from Conexus, which included paperwork needed for his interview. The paperwork included a letter to the U.S. Embassy that indicated that Plaintiff Navarrete had accepted a job with Conexus working at Atrium Health in North Carolina and attached a contract for employment between Plaintiff Navarrete and Conexus that Plaintiff Navarrete was required to sign. The contract that Conexus instructed Plaintiff Navarrete to submit to the U.S. government did not include a "Damages" provision and did not include the Indentured Servitude Penalty. *See* Ex. J.

127.    Plaintiff Navarrete arrived in the United States on May 1, 2021.

128.    Conexus controls the process of obtaining Healthcare Workers' licenses.

129.    Despite arriving in the United States in May 2021, Plaintiff Navarrete could not start working until July 2021 because Conexus failed to activate his nursing license.

130.    From May 2021 to July 2021, Plaintiff Navarrete could not work and relied on his savings to pay for his housing, food, and expenses.

131.    Plaintiff Navarrete finally began working at Atrium Health in July 2021.

132.     For the bulk of his time working for Atrium Health, Plaintiff Navarrete was assigned night shifts in the Medical Surgical Unit. He was not allowed to choose which shifts to work.

133.     Although the nurses who worked the night shift generally earned shift differential pay, the Conexus nurses, including Plaintiff Navarrete, did not.

134.     Nurses that worked at Atrium Health also earned incentive pay when they picked up extra shifts. Although nurses working with Conexus earned incentive pay, they earned less per shift than U.S. citizen nurses doing the same job or picking up the same shift.

135.     Despite having over ten (10) years' experience, Plaintiff Navarrete was earning $28.00 an hour. He knew that U.S. citizen nurses in his unit with the same level of experience or less were being paid more than him per hour. Plaintiff Navarrete asked the nurses in his unit, who were all fresh graduates, what they were earning. They told him that they were earning $30.00 to $31.00 an hour despite doing the same job as him.

136.     Plaintiff Navarrete accordingly received an hourly rate less than what was required by the prevailing wage. He was also paid less than what Conexus initially promised him.

137.     Plaintiff Navarrete found it difficult to make ends meet on the salary he received, and knew he could make more money at another job, but he did not feel he could leave Conexus's employment because he believed that the Sham Contract was binding and believed that leaving Conexus would trigger the Indentured Servitude Penalty. Plaintiff Navarrete believed he would be financially ruined by the Indentured Servitude Penalty. He also feared that, if he quit, Conexus could sue him for breaching the contract and terminate his green card sponsorship. Plaintiff Navarrete knew that these fears were reasonable because he knew another Conexus Healthcare Worker who had left their job and was made to pay the Indentured Servitude Penalty.

138.    Plaintiff Navarrete did not feel he could cease working with Conexus before satisfying the productive hours requirement without threat of significant harm. He accordingly was eager to get through his required 5,000 hours and satisfy his contract as quickly as possible.

139.    Plaintiff Navarrete asked Conexus if he could pick up shifts in other units or move units in order to more quickly amass 5,000 hours. Conexus representatives told him that he was not allowed to do so.

140.    Plaintiff Navarrete also asked Conexus if he could work at another job, as he was having trouble making ends meet on Conexus's hourly rate. Conexus told Plaintiff Navarrete that he could not work for other hospitals and to do so would be a conflict of interest.

141.    Plaintiff Navarrete had no choice but to work the shifts Connexus assigned to him, at the facility and time and frequency that Conexus mandated.

142.    After finishing his 5,000 required productive hours, Plaintiff Navarrete found work elsewhere. The hourly rates at those jobs were $56.00 an hour and $62.00 an hour.

**B.    Conexus Forced Plaintiff Joyce Kristin Gabaton Castillano to Labor for an Unlawfully Low Rate of Pay**

143.    Plaintiff Castillano is a registered nurse.

144.    Plaintiff Castillano is a citizen of the Philippines.

145.    Plaintiff Castillano has worked as a nurse since graduating from nursing school in 2008.

146.    Prior to beginning her work with Conexus, Plaintiff Castillano had approximately thirteen (13) years of experience as a nurse.

147.    From 2008 to 2011, Plaintiff Castillano worked as a nurse in the Philippines.

148.    Plaintiff Castillano had been interested in moving to the U.S. for many years before she applied to Conexus. She believed in the American dream and knew that she could have a better

life and earn a better income to support herself and her family in the U.S.

149.    Plaintiff Castillano knew that to find a job as a foreign nurse in the U.S., it would be helpful to have nursing experience outside the Philippines.

150.    As such, from July 2011 to 2017, Plaintiff Castillano worked as a nurse in Abu Dhabi, United Arab Emirates.

151.    Plaintiff Castillano first heard of Conexus in her search for international staffing agencies. She applied to work with Conexus in early 2018. In May 2018, Plaintiff Castillano had her initial interview. Weeks later, she was offered a position with Conexus.

152.    Plaintiff Castillano was provided a Sham Contract and told that she must sign it to retain the position. This Sham Contract included the Indentured Servitude Penalty. *See* Ex. E.

153.    Conexus began Plaintiff Castillano's immigration process for the EB-3 visa in 2018.

154.    Plaintiff Castillano could not choose which city or state she wanted to live in, or which hospital she wanted to work at.

155.    In or around 2020, Conexus instructed Plaintiff Castillano to interview for a position for Atrium Health in Charlotte, North Carolina.

156.    Conexus told Plaintiff Castillano that if she got the job with Atrium Health, she could not turn it down and she must accept it. Atrium Health agreed to hire Plaintiff Castillano and she accepted.

157.    In December 2020, Plaintiff Castillano had her visa interview at the U.S. Embassy in Abu Dhabi, United Arab Emirates.

158.    Prior to her interview, a Conexus employee named Liza sent Plaintiff Castillano a briefing in preparation for her visa interview. This briefing included tips on how to answer

questions that may be posed by the U.S. government officials. The briefing stated that if the U.S. government asked about fees Healthcare Workers would owe if they did not complete the contract, the Healthcare Worker was to "say NOTHING" (emphasis in original). *See* Ex. G.

159. Prior to her interview, Plaintiff Castillano received a package from Conexus, which included paperwork needed for her interview. The paperwork included a letter to the U.S. Embassy that stated that Plaintiff Castillano had accepted a job with Conexus working at Atrium Health in North Carolina and attached a contract for employment between Plaintiff Castillano and Conexus. The contract that Conexus instructed Plaintiff Castillano to sign and submit to the U.S. government did not include the Indentured Servitude Penalty. *See* Ex. K.

160. Plaintiff Castillano moved to the U.S. in March 2021.

161. Between March 2021 and May 2021, Plaintiff Castillano was not working because Conexus did not secure her nursing license.

162. Although Conexus paid for her accommodation for March 2021, the first month that she was in the U.S., Plaintiff Castillano struggled to afford rent after March, as well as food, and other expenses because she was not being paid by Conexus.

163. Plaintiff Castillano began working as an Endoscopy Nurse at Atrium Health on May 3, 2021.

164. Plaintiff Castillano was told at her orientation that she was required to work 5,000 productive hours. She was told that, if she failed to meet this productive hour requirement, Conexus would sue her to require her to pay the Indentured Servitude Penalty.

165. U.S. citizen nurses that worked at Atrium Health earned shift differentials when they worked nights and weekends. However, Plaintiff Castillano was not paid the required shift differentials like her U.S. citizen counterparts.

166.    Despite having over thirteen (13) years' experience, when Plaintiff Castillano began working at Conexus, her starting hourly rate was $24.00 an hour. At some point during her employment, her pay went up to $28.00 an hour, still well below what U.S. citizen nurses were earning per hour.

167.    Plaintiff Castillano consistently received an hourly rate less than what was required by the prevailing wage. She was also paid less than what Conexus initially promised her to entice her to agree to work for Conexus as a Healthcare Worker.

168.    Plaintiff Castillano knew from speaking with other nurses who worked at Atrium that U.S. citizen nurses in her unit with the same level of experience or less, doing the same job, were getting paid more than her per hour. For instance, Plaintiff Castillano's colleague that had just graduated from nursing school was earning $29.00 an hour while Plaintiff Castillano, with thirteen (13) years' experience, was earning less than her.

169.    Plaintiff Castillano struggled to make ends meet with her Conexus salary and wanted to stop working for Conexus because knew she could easily find a higher paying job elsewhere given her extensive background. In fact, Plaintiff Castillano looked into getting a job as a travel nurse, because she knew she could make double or triple the salary she was making with Conexus. However, Plaintiff Castillano believed that the Sham Contract she signed was binding and felt that she could not quit before fulfilling the required 5,000 productive hours because she was afraid that she would be subject to the Indentured Servitude Provision and litigation.

170.    Conexus told Plaintiff Castillano that she could not work any other jobs while she was working for Conexus.

171.    Ultimately, Plaintiff Castillano decided not to leave Conexus because she was afraid that she would be sued and/or required to pay the Indentured Servitude Penalty to Conexus

if she left. Paying this amount of money was not feasible for her and she knew that having to pay Conexus $50,000 would result in her financial ruin.

172.    Plaintiff Castillano knew that these fears were reasonable because she knew other Conexus Healthcare Workers who had left their jobs and were made to pay the Indentured Servitude Penalty.

173.    After leaving Conexus, Plaintiff Castillano began working directly for Atrium Health. Her hourly rate as a hospital employee, doing the same job she was doing previously, is $50.00.

**C.    Conexus Forced Plaintiff Katryn Grace Aseron to Labor for an Unlawfully Low Rate of Pay**

174.    Plaintiff Aseron is a registered nurse.

175.    Plaintiff Aseron is a citizen of the Philippines.

176.    Plaintiff Aseron has worked as a nurse since graduating from nursing school in 2006.

177.    Plaintiff Aseron worked as a nurse in the Philippines from 2007 to 2010.

178.    From 2010 to 2014, Plaintiff Aseron worked as a nurse in Jeddah, Saudia Arabia.

179.    From 2014 to 2021, Plaintiff Aseron worked as a nurse in Doha, Qatar.

180.    Plaintiff Aseron applied to work with Conexus in August 2018.

181.    Prior to beginning her work with Conexus, Plaintiff Aseron had approximately fifteen (15) years of experience as a Registered Nurse.

182.    Plaintiff Aseron first heard of Conexus in her search for international healthcare staffing agencies.

183.    After Plaintiff Aseron reached out to Conexus to inquire about positions, Conexus sent her a letter about the position and its benefits. Conexus stated that Conexus would pay for

34

flights to the U.S., the first month's housing, shift differentials, a $1,000 deployment bonus, and immigrations costs. Conexus did not inform Plaintiff Aseron that she would have to pay more than $50,000 to break her contract.

184.    Plaintiff Aseron only learned about the Indentured Servitude Penalty when she received an employment agreement from Conexus in September 2018—Conexus's Sham Contract. Plaintiff Aseron signed the Sham Contract, which included the Indentured Servitude Penalty. Conexus told Plaintiff Aseron that the contract was binding. *See* Ex. L.

185.    Conexus began Plaintiff Aseron's immigration process for the EB-3 visa in 2018.

186.    Plaintiff Aseron could not choose the city, state, or hospital where she would work.

187.    Conexus told Plaintiff Aseron she must interview with Atrium Health in North Carolina, and that, if she got the job with Atrium Health, she could not turn it down and she must accept it.

188.    In October 2021, Plaintiff Aseron underwent a visa interview at the U.S. Embassy in Doha, Qatar. Prior to her interview, she received a package from Conexus, which included paperwork needed for her interview. The paperwork included a letter to the U.S. Embassy that indicated that Plaintiff Aseron had accepted a job with Conexus working at Atrium Health in North Carolina and attached another contract for employment between Plaintiff Aseron and Conexus. The 2021 contract that Conexus instructed Plaintiff Aseron to sign and submit to the U.S. government did not include the Indentured Servitude Penalty. *See* Ex. M.

189.    Plaintiff Aseron moved to the U.S. in February 2022. Plaintiff Aseron did not start working until April 2022. Although Conexus paid for her accommodation for February 2022, the first month that she was in the U.S., Plaintiff Aseron had to rely on her savings for rent after February, as well as food, and other expenses.

190.    Conexus required that Plaintiff Aseron take a full-day training prior to working, however, she was not paid for that time.

191.    Plaintiff Aseron began working as an Emergency Department Nurse at Atrium Health in 2022. Plaintiff Aseron was required to work nights and weekend shifts. She had no control over which shifts she was assigned to work.

192.    Conexus instructed Plaintiff Aseron that she was required to work at least 5,000 productive hours, pursuant to the Sham Contract that she signed in 2018. Conexus further instructed that the Sham Contract was binding, and that if, as per that contract, she failed to meet this productive hour requirement, Conexus would sue her to require her to pay the Indentured Servitude Penalty.

193.    Nurses who were not employed by Conexus that worked at Atrium Health earned shift differentials when they worked nights and weekends. However, Plaintiff Aseron was not paid shift differentials like her counterparts.

194.    Despite having over fifteen (15) years' experience, when Plaintiff Aseron began working at Conexus, her starting hourly rate was $28.00 an hour, well below what U.S. citizen nurses in the Emergency Department were earning per hour.

195.    Plaintiff Aseron consistently received an hourly rate less than what was required by the prevailing wage. She was also paid less than what Conexus initially promised her to entice her to agree to work for Conexus as a Healthcare Worker.

196.    Plaintiff Aseron knew from speaking with other nurses who worked at Atrium Health that U.S. citizen nurses in her unit with the same level of experience or less, doing the same job, were earning more than her per hour.

197.    In February 2023, Plaintiff Aseron realized that she could not survive on the rate

Conexus paid her. Although she was afraid of the $50,000 Indentured Servitude Penalty that Conexus told her she would have to pay under the Sham Contract, she emailed her Engagement Manager at Conexus and requested a meeting to discuss the process of resignation. In response, Conexus informed her by email that she would be subject to the Indentured Servitude Penalty but instructed, for the first time, that the amount owed pursuant to the Indentured Servitude Penalty was reduced for each 1,000 hours she had worked. Prior to submitting her resignation, Plaintiff Aseron believed she would be subject to the full Indentured Servitude Penalty and was not aware that she could instead pay a lesser amount. At that time, however, Plaintiff Aseron was still far from finishing the 5,000-hour requirement, such that the amount she would owe after the reduction would still amount to a substantial economic harm.

198.    In March 2023, Conexus sent Plaintiff Aseron a letter that stated, "Pursuant to…the Agreement, which was signed by you on September 28, 2018, you agreed to complete 5,000 productive hours…Pursuant to Section 7 of the Agreement, you agreed that Conexus could terminate your employment if you failed or refused to complete the required 5,000 productive hours."

199.    Conexus knew or should have known, when it sent Plaintiff Aseron this letter, that she was not bound by the Sham Contract. The Sham Contract was not binding both because the Indentured Servitude Penalty is unenforceable under Texas law, and additionally because the Sham Contract, which Plaintiff Aseron signed in 2018, was superseded by the contract Plaintiff Aseron signed and submitted to the U.S. government in 2021, which did not include the Indentured Servitude Penalty. Conexus nevertheless falsely told Plaintiff Aseron that if she quit, she would be in breach of her contract, which would trigger the Indentured Servitude Penalty.

200.    Plaintiff Aseron reasonably believed that the sham 2018 contract was valid and

37

binding and agreed to pay the amount Conexus requested to leave her employment.

201.    In addition to the letter, Conexus sent Plaintiff Aseron a summary of the expenses she owed to Conexus in addition to the prorated $50,000 Indentured Servitude Penalty. The list of purported damages included vague and unclear entries that Conexus contended it was owed as "actual damages," such as $18,867.00 for "Other personnel and infrastructure expenses to deploy candidate."

202.    The total amount that Plaintiff Aseron was told that she owed Conexus, including "actual damages" and the prorated $50,000 indenture, totaled $33,787.21. However, Conexus told Plaintiff Aseron that if she wanted to avoid collections and litigation, she could pay $27,029.96 as a settlement amount.

203.    After leaving Conexus, Plaintiff Aseron was able to find another job as a registered nurse where she earns $43.00 an hour.

**D.    Conexus Forced Plaintiff Jhon Gerald Reloquio to Labor for an Unlawfully Low Rate of Pay**

204.    Plaintiff Reloquio is a registered nurse.

205.    Plaintiff Reloquio is a citizen of the Philippines.

206.    Plaintiff Reloquio has worked as a nurse since graduating from nursing school in 2014.

207.    Plaintiff Reloquio worked as a nurse in the Philippines from 2015 to 2022.

208.    Prior to beginning his work with Conexus, Plaintiff Reloquio had approximately seven (7) years of experience as a Registered Nurse.

209.    Plaintiff Reloquio first heard of Conexus in a Facebook group for Filipino nurses. He applied to work for Conexus through Conexus's website in 2018.

210.    Plaintiff Reloquio interviewed with Conexus in 2018. They informed him they wanted to hire him, and he verbally accepted. At that time, he was not told anything about the Indentured Servitude Penalty or any expectation that he would work 5,000 productive hours to satisfy his contract.

211.    Conexus subsequently sent Plaintiff Reloquio its Sham Contract in 2018, which included the Indentured Servitude Provision. This was the first indication Plaintiff Reloquio received that he would be required to work 5,000 hours at minimum before being able to leave Conexus's employ without penalty.

212.    Conexus began Plaintiff Reloquio's immigration process for the EB-3 visa in 2018.

213.    Plaintiff Reloquio could not choose the city, state, or hospital at which he would be stationed. Conexus told Plaintiff Reloquio he must interview with the hospitals they set him up with. Conexus told Plaintiff Reloquio that if he got a job with the hospitals he interviewed with, he could not turn it down and he must accept the placement.

214.    In 2021, Plaintiff Reloquio interviewed for a job at a hospital in Texas. He did the job interview in Conexus's office in Manila, Philippines. He received an offer for the job and accordingly accepted.

215.    Sometime later, Conexus unilaterally told Plaintiff Reloquio he would instead work at Atrium Health in Charlotte, North Carolina. Plaintiff Reloquio had no say in his job placement.

216.    Plaintiff Reloquio was told that his hourly rate at Atrium Health would be $28.00 an hour. He was also told by Conexus staff that he would earn extra pay in the form of a shift differential when he worked nights and weekends and a $1,000 bonus for every 1,000 productive hours worked.

217.    In April 2022, Plaintiff Reloquio had his interview at the U.S. Embassy in Manila,

Philippines. Prior to his interview, Conexus required that Plaintiff Reloquio practice for the visa interview at the Conexus offices in Manila. Plaintiff Reloquio did a mock visa interview with Lisa Perolina, a case manager that worked for Conexus in Manila. During the mock visa interview, Ms. Perolina told Plaintiff Reloquio that he should not tell the U.S. officials conducting his interview what his hourly wage at Atrium Health would be.

218.    Prior to his interview Conexus sent Plaintiff Reloquio a briefing in preparation for his visa interview. This briefing included tips on how to answer questions that may be posed by the U.S. government officials. The briefing stated that if the U.S. government asked about fees Healthcare Workers would owe if they did not complete the contract, the Healthcare Worker was to "say NOTHING" (emphasis in original). *See* Ex. F.

219.    Prior to going to the interview at the U.S. Embassy, Plaintiff Reloquio was required to go to the Conexus office in Manila and pick up documents to take to his interview. The paperwork included a "Revised Employment Agreement" between Conexus and Plaintiff Reloquio. The contract that Conexus instructed Plaintiff Reloquio to sign and submit to the U.S. government did not include the Indentured Servitude Penalty. *See* Ex. N.

220.    Conexus knew or should have known that the Sham Contract and its included Indentured Servitude Penalty were unlawful and not binding on Plaintiff Reloquio. However, the documents that Conexus sent to Plaintiff Reloquio made him believe that the Sham Contract was binding, and the Indentured Servitude Penalty was valid.

221.    Plaintiff Reloquio moved to the U.S. in August 2022. When he arrived in the U.S., he was told that he would not be working at the main Atrium Health campus, as he was previously told, but rather, would be working at Union West, which is thirty (30) minutes away from Charlotte.

222.    Plaintiff Reloquio began working as a bedside nurse at Union West in November 2022. In January 2023, Plaintiff Reloquio was promoted to a charge nurse. Plaintiff Reloquio was required to work nights and weekend shifts.

223.    Plaintiff Reloquio understood that he was required to work at least 5,000 productive hours to satisfy his Sham Contract and, if he did not, Conexus would sue him and/or require him to pay the Indentured Servitude Penalty.

224.    U.S. citizen nurses that worked at Union West earned shift differentials when they worked nights and weekends. However, Plaintiff Reloquio was not paid shift differentials like his U.S. citizen counterparts, despite being told by Conexus that he would receive them.

225.    Plaintiff Reloquio did not receive the promised bonus of $1,000 for every 1,000 productive hours worked.

226.    Despite having over seven (7) years' experience, when Plaintiff Reloquio began working at Conexus, his starting hourly rate was $28.00 an hour, well below what U.S. citizen nurses were earning per hour. When Plaintiff Reloquio became a supervisory charge nurse, he was paid $29.00 an hour for each shift he was a charge nurse, which was far below the hourly rate U.S. citizen charge nurses earned. Conexus knew that Plaintiff Reloquio was not earning the prevailing wage for a supervisor but failed to pay him the correct hourly rate.

227.    Plaintiff Reloquio consistently received an hourly rate less than what was required by the prevailing wage. He was also paid less than what Conexus initially promised him to entice him to agree to work for Conexus as a Healthcare Worker.

228.    Plaintiff Reloquio knew from speaking with other nurses who worked at Union West that that U.S. citizen nurses in his unit with the same level of experience or less, with the same jobs, were getting more than him per hour when he worked as a bedside nurse or as a charge

41

nurse.

229.    Eventually, in October 2023, Plaintiff Reloquio realized that he could not survive on the meager salary Conexus paid him. He emailed Helen Menendez, a Senior Manager at Conexus, and requested an explanation about why he was not being paid the proper prevailing wage, shift differential, and the bonuses he was owed. Plaintiff Reloquio told Conexus that he would file a legal complaint if they could not provide him with an explanation.

230.    Soon after, in December 2023, Conexus told Plaintiff Reloquio and the other nurses that their hourly rate would increase from $28.00 an hour to $34.00 an hour.

231.    Although Plaintiff Reloquio knew he could find a better-paying job elsewhere, he was afraid of leaving his job at Conexus because he reasonably believed, based on what Conexus told him and what was in his employment documents, that he would be sued for the Indentured Servitude Penalty.

232.    Plaintiff Reloquio was on Facebook groups with other nurses that worked with Conexus and heard from them about Conexus filing lawsuits and collecting the Indentured Servitude Penalty from them.

## CLASS ALLEGATIONS

233.    Plaintiffs bring this action on behalf of the Healthcare Workers Class as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

234.    <u>Numerosity</u>: The Healthcare Workers Class is so numerous that joinder of all class members is impracticable. Defendant reports that it has recruited thousands of individuals to the United States in the last fourteen years. These class members can be identified based on Defendant's records.

235.    <u>Commonality</u>: Common questions of law and fact exist as to all members of the Healthcare Workers Class and predominate over any questions solely affecting individual members, including but not limited to:

a.    Whether Defendant obtains labor by using serious harm or threats of serious harm in violation of 18 U.S.C. § 1589(a)(2);

b.    Whether Defendant's practice of financial threats and control constitute serious harm or threats of serious harm in violation of 18 U.S.C. § 1589(a)(2);

c.    Whether Defendant obtains labor by using a scheme, plan, or pattern intended to cause a person to believe that, if they did not perform such labor or services, that person would suffer serious harm or physical restraint in violation of 18 U.S.C. § 1589(a)(4);

d.    Whether Defendant's practice of forcing the Healthcare Workers Class to labor at client healthcare facilities constitutes a scheme, plan, or pattern intended to cause Healthcare Workers to believe that, if they did not perform such labor or services, they would suffer serious harm or physical restraint in violation of 18 U.S.C. § 1589(a)(4);

e.    Whether Defendant knowingly recruits Healthcare Workers for forced labor;

f.    Whether Defendant knowingly benefits from participation in a venture which obtains labor in violation of the TVPRA while "knowing or in reckless disregard of the fact" that the venture has obtained labor by that means;

g.    Whether Defendant knowingly benefits from its violations of the TVPRA;

h.    Whether Defendant conspired to violate 18 U.S.C. § 1589;

i.    Whether Defendant conspired to violate 18 U.S.C. § 1590;

j.    Whether Defendant attempted to violate 18 U.S.C. § 1589;

k.     Whether Defendant attempted to violate 18 U.S.C. § 1590;

l.     The proper measure of damages;

m.     The proper preliminary and permanent injunctive relief that must issue against Defendant; and

n.     The proper measure of punitive damages.

236.    <u>Typicality</u>: Plaintiffs' claims are typical of the members of the Healthcare Workers Class. For example, Plaintiffs, like other putative class members, labored for Conexus and were subject to common policies and procedures. Further, Defendant treated Plaintiffs like it treated other class members, in accordance with its standard policies and practices.

237.    <u>Adequacy</u>: Plaintiffs will fairly and adequately protect the interests of the Healthcare Workers Class. Plaintiffs are committed to the prosecution of this action and have retained counsel that numerous courts have found sufficiently experienced in class actions to be appointed as class counsel. There are no conflicts among Plaintiffs and the Healthcare Workers Class they seek to represent.

238.    Class certification is appropriate under Rule 23(b)(3) of the Federal Rules of Civil Procedure because questions of law and fact common to the Healthcare Workers Class predominate over any questions affecting only individual members of the Healthcare Workers Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. The core principles governing Defendant's forced labor program are uniform across the Healthcare Workers Class. Class certification will also obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendant's practices. Common questions of law and fact also predominate as to Plaintiffs' claim that Defendant attempted to obtain, recruit, and benefit from forced labor in violation of the TVPRA.

Defendant employed uniform structures, policies, and procedures in its attempt to obtain, recruit, and benefit from forced labor performed by Plaintiffs and the Healthcare Workers Class. Moreover, management of this action as a class action will not likely present any difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all class members' claims in a single forum.

239.    Plaintiffs intend to send notice to all members of the Healthcare Workers Class to the extent required by Rule 23(c)(2) of the Federal Rules of Civil Procedure. The names and addresses of the class members are available from Defendant's records and other available sources.

240.    This action concerns Conexus's policies and practices that ensure that all Healthcare Workers cannot leave their jobs without fear of serious financial harm. All members of the Healthcare Workers Class seek the same injunctive relief. Accordingly, final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

## <u>COUNT ONE</u>

**Violation of the Trafficking Victims Protection Reauthorization Act (TVPRA)**
**18 U.S.C. §§ 1589(a) and 1595(a) – Obtaining Trafficked Labor**

**(On behalf of Plaintiffs and the Healthcare Workers Class)**

241.    All previous paragraphs are incorporated as though fully set forth herein.

242.    It is a violation of the TVPRA to "knowingly provide[] or obtain[] the labor or services of a person . . . (2) by means of serious harm or threats of serious harm . . . ; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm . . . ." 18 U.S.C. § 1589(a).

243.    The TVPRA defines "serious harm" to include nonphysical harm, "including psychological, financial, or reputational harm, that is sufficiently serious . . . to compel a

reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." *Id.* § 1589(c)(2).

244.    Defendant obtained the labor of Plaintiffs and members of the Healthcare Workers Class through threats of serious harm and abuse of the legal system, through a scheme to make Plaintiffs and members of the Healthcare Workers Class believe they would suffer serious financial harm, face collections, or lawsuits.

245.    Defendant kept Plaintiffs and members of the Healthcare Workers Class laboring without pay under inhumane conditions by preying on their vulnerabilities.

246.    Defendant obtained unpaid labor from Plaintiffs and members of the Healthcare Workers Class through serious harm, threats of serious harm, and abuse of the legal system.

247.    Defendant refused to pay proper wages to Plaintiffs and members of the Healthcare Workers Class for their hours worked, required them to sign Sham Contracts, and threatened them with financial harm and collections and lawsuits to pay the Indentured Servitude Penalty if they refused to labor with Conexus.

248.    Defendant kept Plaintiffs and members of the Healthcare Workers Class working under inhumane conditions by preying on their vulnerability as foreign nationals and reliance on Defendant for immigration status and wages.

249.    Defendant's use of such means to obtain the labor of Plaintiffs and members of the Healthcare Workers Class was knowing and intentional.

250.    Plaintiffs and members of the Healthcare Workers Class suffered damages as a result of Defendant's conduct. Those damages include the value of the labor Plaintiffs and members of the Healthcare Workers Class provided to Defendant, as well as emotional distress and other damages.

251.    Plaintiffs and members of the Healthcare Workers Class are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with preliminary and permanent injunctive relief and reasonable attorneys' fees and the costs of this action.

## COUNT TWO

**Violation of the Trafficking Victims Protection Reauthorization Act (TVPRA)**
**18 U.S.C. §§ 1589(b) and 1595(a) – Benefitting from Trafficked Labor**

### (On Behalf of Plaintiffs and the Healthcare Workers Class)

252.    All previous paragraphs are incorporated as though fully set forth herein.

253.    It is a violation of the TVPRA to "knowingly benefit" from participation in a venture which obtains labor in violation of the TVPRA, while "knowing or in reckless disregard of the fact" that the venture has obtained labor through such means. 18 U.S.C. § 1589(b).

254.    An individual may bring a civil action against a "perpetrator [] or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation" of the TVPRA. 18 U.S.C. § 1595(a).

255.    Defendant participated in a venture to obtain labor in violation of the TVPRA because it financially benefited from the forced labor, by which Defendant obtained labor in violation of the TVPRA.

256.    Defendant knowingly benefited from its participation in the forced labor venture described herein by obtaining labor in its commercial operations without paying market wages and willfully benefiting from forced labor.

257.    Defendant has knowingly benefited from its participation in the forced labor venture described herein by obtaining labor without incurring payroll and tax obligations, allowing Defendant to repurpose funds that would otherwise be used to pay paid staff to perform these tasks.

258.    Defendant knowingly benefited from its participation in the ventures described herein because obtaining labor in violation of the TVPRA increased its profit and reduced the amount it paid to Plaintiffs and the Healthcare Workers Class.

259.    Defendant knew or recklessly disregarded the fact that the ventures described herein engaged in obtaining forced labor.

260.    Plaintiffs and members of the Healthcare Workers Class suffered damages as a result of Defendant's conduct. Those damages include the value of the labor Plaintiffs and Class members provided to Defendant, as well as emotional distress and other damages.

261.    Plaintiffs and members of the Healthcare Workers Class are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with preliminary and permanent injunctive relief and reasonable attorneys' fees and the costs of this action.

## COUNT THREE

**Violation of the Trafficking Victims Protection Reauthorization Act (TVPRA)
18 U.S.C. §§ 1590(a) and 1595(a) – Recruiting, Harboring, and Transporting Trafficked
Labor**

**(On Behalf of Plaintiffs and the Healthcare Workers Class)**

262.    All previous paragraphs are incorporated as though fully set forth herein.

263.    It is a violation of the TVPRA to "knowingly recruit[], harbor[], transport[] . . . or obtain[] by any means, any person for labor or services in violation of" the TVPRA. 18 U.S.C. § 1590(a).

264.    Defendant knowingly recruited, harbored, and transported Plaintiffs and members of the Healthcare Workers Class in violation of the TVPRA through the means described herein.

265.    Plaintiffs and members of the Healthcare Workers Class suffered damages as a result of Defendant's conduct. Those damages include the value of the labor Plaintiffs and members of the Healthcare Workers Class provided to Defendant, as well as emotional distress and other damages.

266.    Plaintiffs and members of the Healthcare Workers Class are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with preliminary and permanent injunctive relief and reasonable attorneys' fees and the costs of this action.

## <u>COUNT FOUR</u>

**Violation of the Trafficking Victims Protection Reauthorization Act (TVPRA)
18 U.S.C. §§ 1594(b) and 1595(a) – Conspiracy to Recruit, Harbor, Transport, Obtain, and Benefit from Trafficked Labor**

**(On Behalf of Plaintiffs and the Healthcare Workers Class)**

267.    All previous paragraphs are incorporated as though fully set forth herein.

268.    It is a violation of the TVPRA to "conspire[] with another" to "knowingly recruit[], harbor[], transport[] . . . or obtain[] by any means, any person for labor or services in violation of" the TVPRA. 18 U.S.C. § 1594(b).

269.    It is a violation of the TVPRA to "conspire[] with another" to "knowingly benefit" from participation in a venture which obtains labor in violation of the TVPRA, while "knowing or in reckless disregard of the fact" that the venture has obtained labor through such means. 18 U.S.C. §§ 1589(b), 1594(b).

270.    Defendant conspired to recruit Plaintiffs and members of the Healthcare Workers Class to its client healthcare facilities and ultimately obtained their forced labor by coercing them to work.

271.    Defendant conspired to benefit from Plaintiffs' and members of the Healthcare Workers Class's forced labor by ensuring they were not paid their proper wages and would have to pay the Indentured Service Penalty for leaving.

272.    Plaintiffs and members of the Healthcare Workers Class suffered damages as a result of Defendant's conduct. Those damages include the value of the labor Plaintiff and members of the Healthcare Workers Class provided to Defendant, as well as emotional distress and other damages.

273.    Plaintiffs and members of the Healthcare Workers Class are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with preliminary and permanent injunctive relief and reasonable attorneys' fees and the costs of this action.

## <u>COUNT FIVE</u>

**Violation of the Trafficking Victims Protection Reauthorization Act (TVPRA)
18 U.S.C. §§ 1594(a) and 1595(a) – Attempted Trafficking**

**(On Behalf of Plaintiffs and the Healthcare Workers Class)**

274.    All previous paragraphs are incorporated as though fully set forth herein.

275.    Attempts to violate the TVPRA are themselves violations of the TVPRA. 18 U.S.C. § 1594(a).

276.    Defendant attempts to violate 18 U.S.C. §§ 1589 and 1590 by knowingly using its structure, policies, and procedures in an attempt to obtain the labor of Plaintiffs and members of the Healthcare Workers Class.

277.    Plaintiffs and members of the Healthcare Workers Class suffered damages as a result of Defendant's conduct. Those damages include the value of the labor Plaintiffs and Class members provided to Defendant, as well as emotional distress and other damages.

278.    Plaintiffs and members of the Healthcare Workers Class are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with preliminary and permanent injunctive relief and reasonable attorneys' fees and the costs of this action.

## COUNT SIX

### Violation of the Fair Labor Standards Act (FLSA)

### (On Behalf of Plaintiffs and the Collective Members)

279.    All previous paragraphs are incorporated as though fully set forth herein.

280.    The FLSA requires that covered non-exempt employees be compensated for all hours worked in excess of forty (40) hours per week at a rate not less than one and one-half (1 ½) times the regular rate at which they are employed. *See* 29 U.S.C. § 207 and 29 C.F.R. § 552.100.

281.    The FLSA defines "employer" broadly to include "any person acting directly or indirectly in the interest of an employer in relation to an employee..." 29 U.S.C. § 203(d).

282.    Defendant is subject to the wage requirements of the FLSA because Defendant is an "employer" under 29 U.S.C. § 203(d) and 29 C.F.R. § 552.109(a).

283.    At all relevant times, Defendant has been an "employer" engaged in interstate commerce and/or in the production of goods for commerce, within the meaning of the FLSA, 29 U.S.C. § 203 and 29 C.F.R. § 552.100.

284.    During all relevant times, Plaintiffs and Collective Members have been covered employees entitled to the FLSA's protections. *See* 29 U.S.C. § 203(e).

285.     Plaintiffs and the Collective Members are not exempt from the requirements of the FLSA per 29 C.F.R. § 541.3.

286.     Defendant, pursuant to its policies and practices, has failed and refused to pay overtime wages for all hours worked in excess of forty (40) in a workweek by Plaintiffs and the Collective Members during the relevant time period.

287.     Defendant has knowingly failed to properly compensate Plaintiffs and the Collective Members' overtime wages for hours worked in excess of forty (40) in a workweek, in violation of 29 U.S.C. § 207 and 29 C.F.R. § 552.100.

288.     More specifically, Defendant has failed to include non-discretionary bonuses in calculating the Plaintiffs' and Collective members' "regular rate" for the purpose of calculating the applicable time-and-a-half overtime premium, and Defendant has failed to compensate Plaintiffs and Collective Members for off-the-clock work.

289.     In violating the FLSA, Defendant has acted willfully and with reckless disregard of clearly applicable FLSA provisions.

290.     Pursuant to 29 U.S.C. § 216(b), employers such as Defendant, who intentionally fail to pay an employee's wages in conformance with the FLSA shall be liable to the employee for unpaid wages, liquidated damages, court costs, and attorneys' fees incurred in recovering the unpaid wages.

<u>**COUNT SEVEN**</u>

**Declaratory Judgment**

**(On Behalf of Plaintiffs and the Healthcare Workers Class)**

291.     All previous paragraphs are incorporated as though fully set forth herein.

292.     Plaintiffs and the Healthcare Workers Class seek a declaratory judgment that

Defendant's liquidated damages clause is per se illegal under Texas law.

293.    Under Texas law, in order to enforce a liquidated damage clause, the court must find: (1) that the harm caused by the breach is incapable or difficult of estimation, and (2) that the amount of liquidated damages called for is a reasonable forecast of just compensation." *Cf.* TEX.BUS. & COM.CODE § 2.718(a), see also *Phillips v. Phillips*, 820 S.W.2d 785, 788 (Tex. 1991).

294.    Defendant requires Healthcare Workers to sign a contract that includes a liquidated damages provision. Conexus's liquidated damages provision states that upon breach, Healthcare Workers "agree to immediately pay Conexus as liquidated damages and not as a penalty, the amount of not less than $50,000 USD *plus actual expenses* (legally recoverable) incurred by Conexus on Nurse's behalf." (emphasis added).

295.    Defendant's liquidated damages provision is per se illegal because: 1) Defendant can, and does, easily estimate the amount of actual damages incurred by breach of contract, and 2) the liquidated damages provision is an unreasonable amount given that it can be over a year's take home pay for the Healthcare Workers Class and is disproportionate to Defendant's actual damages.

296.    So long as Defendant enforces the liquidated damages provision, whose terms are illegal and unenforceable under Texas law, Plaintiffs and the Healthcare Workers Class will continue to suffer economic injury that constitutes serious financial harm.

297.    Plaintiffs therefore respectfully request that this Court declare that Defendant's liquidated damages provision is illegal, unenforceable, and void, and requests such further and other relief as it deems just and proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs seeks the following relief on behalf of themselves and the Class Members:

a. Determining that this action may proceed as a class action under Fed. R. Civ. P. 23(b)(2)-(3);

b. Designating Plaintiffs as representatives for the Class and designating Plaintiffs' counsel as counsel for the Class;

c. Issuing proper notice to the Class at Defendant's expense;

d. Leave to add additional plaintiffs and/or state law claims by motion or any other method approved by the Court;

e. Declaring Defendant committed violations of the TVPRA;

f. Preliminary and permanent injunctive relief requiring Defendant to cease violations of the TVPRA and prohibiting violations in the future;

g. Awarding damages as provided by the TVPRA, including punitive damages;

h. An order permitting this litigation to proceed as an FLSA collective action pursuant to 29 U.S.C. § 216(b);

i. Prompt notice, pursuant to 29 U.S.C. § 216(b), of this litigation to all potential Collective Members;

j. Back pay damages (including overtime compensation) and prejudgment interest to the fullest extent permitted under the law;

k. Liquidated damages to the fullest extent permitted under the law;

l. Declaratory judgment that the liquidated damages provision is illegal, unenforceable, and void;

m. Litigation costs, expenses, and attorneys' fees to the fullest extent permitted under the law; and

n. Such other and further relief as this Court deems just and proper.

## <u>JURY DEMAND</u>

Plaintiffs hereby demand a trial by jury of all issues so triable pursuant to Fed. R. Civ. P. 38.

Dated: February 13, 2025                    Respectfully submitted,


                                            *s/ Alexandra K. Piazza*
                                            Alexandra K. Piazza
                                            Fed Bar No. 2330782
                                            **BERGER MONTAGUE PC**
                                            8241 La Mesa Blvd, Suite A
                                            La Mesa, CA 91942
                                            Telephone: (215) 875-3063
                                            Facsimile: (215) 875-4604
                                            apiazza@bm.net

                                            Michael Dell'Angelo*
                                            Michaela Wallin*
                                            **BERGER MONTAGUE PC**
                                            1818 Market Street, Suite 3600
                                            Philadelphia, PA 19103
                                            Telephone: (215) 875-4635
                                            Facsimile: (215) 875-4604
                                            mdellangelo@bm.net
                                            mwallin@bm.net

                                            Mariyam Hussain*
                                            **BERGER MONTAGUE PC**
                                            110 N. Wacker Drive, Suite 2500
                                            Chicago, IL 60606
                                            Telephone: (773) 666-4316
                                            mhussain@bm.net

                                            Thomas W. Elrod*
                                            Lauren Wands*
                                            **KIRBY MCINERNEY LLP**
                                            250 Park Avenue, Suite 820
                                            New York, NY 10177
                                            Telephone: (212) 371-6600
                                            telrod@kmllp.com
                                            lwands@kmllp.com

                                            *Counsel for Plaintiffs and the Proposed Class
                                            and Collective Members*

                                            * Pro hac vice forthcoming